UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:05CV-432-H

HELEN MITCHELL                                                                        PLAINTIFF

V.

THE HARTFORD                                                                        DEFENDANT

**MEMORANDUM OPINION**

This is a claim under the Employee Retirement Income Security Act ("ERISA") in which Plaintiff, Helen Mitchell challenges Hartford Life and Accident Insurance Company's ("Hartford") decision to terminate Plaintiff's long term disability benefits on the basis that she was no longer disabled from performing her occupation. The parties have agreed to the administrative record, have filed briefs and have presented their arguments directly to the Court at a conference.

I.

Plaintiff worked as an Environmental Services Supervisor for Norton Healthcare until leaving on November 15, 2002, due to an upper respiratory infection, abdominal pain and gastroenteritis. Hartford was the administrator of the Norton's ERISA plan and in particular its disability insurance plan. Initially, Plaintiff received short term disability benefits. On June 20, 2003, Hartford received an update on Mitchell's condition from Dr. Giovese Rondo advising that she needed to remain at home. As a result, Hartford began paying long term disability benefits.

According to express Hartford Policy (the "Policy") language, Plaintiff would receive

benefits so long as she continued to meet the Policy definition of disabled. Also, from time to time, Hartford requested that Plaintiff submit updated medical information and periodic physician statements. On December 15, 2003, Hartford requested Plaintiff complete a Claimant Questionnaire. When she did not respond, Hartford advised her that if it did not receive the Questionnaire by February 17, 2004 further benefits might be denied. This time, Plaintiff returned the Questionnaire.

On March 4, 2004, Hartford wrote Mitchell asking for an update from her attending physician. After not receiving a response, Hartford wrote Mitchell reminding her of her obligation under the Policy to provide the necessary medical evidence to support her claim and advising that as a result of her failure to do so, it was terminating her benefits. Plaintiff eventually forwarded the attending physician statement. Thereafter, Hartford informed Mitchell that it would continue to pay benefits while it evaluated her disability claim.

At some point, Hartford submitted all Plaintiff's medical records to Dr. Todd Lyon, a board certified family practitioner, for his independent medical review. In addition to the medical records he received, Dr. Lyon conducted telephone interviews of Mitchell's treating physicians, Dr. Rondo, a family practitioner, and Dr. Gleason, a rheumatologist. Based on his review of the records and his interviews, Dr. Lyon reported that while the records reflected that Mitchell complained of myalgias, fatigue, weakness and low grade fever and that she may have an undifferentiated connective tissue disorder, there was no established rheumatologic diagnosis. Dr. Lyon also had a telephone conversation with Dr. Gleason. According to Dr. Lyon's summary of that conversation, Dr. Gleason reported,

> Ms. Mitchell had not met the criteria for any specific
> rheumatologic diagnosis. She indicated that Ms. Mitchell's

>  subjective complaints were unexplained by her objective findings. She indicated that Ms. Mitchell had no objective findings which would suggest that she had any work limitations. Therefore, based on her evaluations of Ms. Mitchell, Dr. Gleason felt there was no evidence that Ms. Mitchell required work limitations.

Dr. Lyon wrote Dr. Gleason summarizing their conversation and invited Dr. Gleason to make any additions or corrections. Dr. Gleason did not respond.

Dr. Lyon also considered the records of Dr. Rondo. At that time, Dr. Rondo's records indicated that Plaintiff had "slight" limitations for walking, pushing, and pulling; "mild," "chronic" limitation for reaching and overhead work; and "moderate," "temporary" limitations for lifting, carrying, repetitive hand motion activities and keyboarding. Following up on these reported limitations, Dr. Lyon had a telephone conversation with Dr. Rondo on July 26, 2004. At that time Dr. Rondo reported having seen Plaintiff three weeks before. When asked her current opinion of Mitchell's work capacity, Dr. Rondo reported that she did not have an opinion and would defer to Dr. Gleason.

Dr. Lyon concluded that "after reviewing the medical records forwarded to me on Helen Mitchell and after interviewing Drs. Gleason and Rondo, I find that the information reviewed leads me to conclude that Helen Mitchell retains the capacity for full-time working without any evidence suggesting the need for restrictions and/or limitations. Therefore, it is my opinion that the clinical information on Helen Mitchell suggests she is capable of full-time working at any demand level."

On August 9, 2004, Hartford informed Plaintiff that it had completed its review of her

claim for benefits.[1]  Hartford concluded that Plaintiff no longer met the definition of disabled under the Policy and informed her that no benefits would be paid beyond August 9, 2004.

On January 5, 2005, Plaintiff appealed Hartford's decision, alleging she suffered from "severe fibromyalgia, severe fatigue, joint pains, depression, etc." making her totally disabled from her occupation.  Plaintiff submitted a report from of [Christopher Mueller] of Functional Imagining and Assessment, Inc. dated February 7, 2005, and the office notes of Dr. Gleason from February 5, 2003 through August 30, 2004.  Mueller's chiropractor report states, "All my remarks under 'Impressions' are simply educational and/or conjecture based upon the info [sic] I have at this time.  My remarks are not intended to imply I am making a diagnosis of Ms. Mitchell's condition, but to offer insight her primary care doctor might use to her advantage."  Mitchell also submitted to Hartford a copy of a letter from the Social Security Office stating that Plaintiff was awarded Social Security disability benefits.

Hartford wanted to conduct an independent medical examination.  Plaintiff's counsel advised Hartford that someone from his office accompany must Plaintiff during the entire examination.  The exam never occurred.  Instead, Hartford submitted all the medical records it had received as well as Norton's description of Mitchell's occupation to Dr. Brian Peck, a board certified rheumatologist working for University Disability Consortium.  Based on his review of the records, Dr. Peck found that while Plaintiff experienced fatigue, myalgias, joint pain and hair

---

[1] In its review, Hartford had relied upon the language of the Policy and reviewed all of the materials contained in Mitchell's file, including: Mitchell's April 29, 2003 long term disability income benefits questionnaire; the claimant questionnaire received February 23, 2004; the Attending Physician Statements of Dr. Recevor, Dr. Gleason, and Dr. Rondo; the office notes and medical records of Dr. Recevor from September 29, 2002 to December 2, 2002; the office notes and medical records of Dr. Gleason from February 5, 2003 to September 12, 2003; the office notes and medical records of Dr. Rondo from December 6, 2002 to August 7, 2003; CVS Pharmacy records of November 26, 2002; Walgreens Pharmacy records from May 3, 2002 to March 11, 2003; Jewish Hospital records for March 3, 2002; a description of Mitchell's job provided by her employer; and the independent medical review completed by Dr. Lyon on July 27, 2004.

loss, no specific diagnosis had been made. Reviewing Dr. Rondo's records, Dr. Peck found the only specific diagnosis of obesity and depression. However, the diagnosis of depression was not made by a mental health professional and Plaintiff was not being treated or taking medications for either diagnosis. From Dr. Gleason's records Dr. Peck concluded that Dr. Gleason had noted symptoms associated with CREST syndrome, but had never actually diagnosed the syndrome.

Dr. Peck also reviewed Mueller's thermographic study and found it unhelpful. He wrote that

> Although the few areas of increased heat emission noted on the thermogram may indicate areas of muscle pain or over-use, these findings are not diagnostic. The thermogram is generally not accepted as a standard medical test, due to its inherent inaccuracy and the non-specific character of the heat patterns detected. The remainder of the report is filled with conclusions which are medically unsupportable.

There is no evidence in the record that any of Plaintiff's treating physicians relied upon the thermogram or that Plaintiff ever submitted the thermogram to her treating doctors for evaluation.

Dr. Peck also spoke with Drs. Gleason and Rondo. Dr. Gleason reportedly said that Plaintiff had not exhibited enough clinical or laboratory findings to make a definite diagnosis of a particular connective tissue disease. Furthermore, Dr. Gleason opined that Plaintiff's subjective complaints and her self-reported limitations were not reasonable and were not consistent with Dr. Gleason's findings. As Dr. Peck reported, "Dr. Gleason felt that the patient's chief complaint regarding employment was fatigue. She felt that there was probably some fatigue present, but that it was not enough to preclude the type of employment described. She felt that the patient exhibited symptom magnification." Dr. Peck confirmed his understanding of

his conversation with Dr. Gleason in a letter.

Dr. Rondo reportedly said that Plaintiff had non-specific symptoms and that fatigue seemed to be the primary complaint. She had not found any objective physical, laboratory or x-ray signs to explain her symptoms. She reported that on her last visit, Plaintiff was able to perform the requirements of her job as an Environmental Services Supervisor. Again, Dr. Peck confirmed his understanding of his conversation with the doctor. Dr. Peck agreed with Mitchell's own treating physicians and concluded that, "[t]he evidence provided indicates that the claimant should be able to perform her described job without restrictions."

On April 12, 2005, Hartford concluded its review of Plaintiff's appeal and determined that the file documentation did not support her inability to perform one or more of the Essential Duties of her occupation as of August 10, 2004. In its letter to Plaintiff, Hartford fully set forth the basis for this conclusion. As Hartford wrote to Plaintiff's counsel, "addressing the question of disability requires a concise understanding of the claimant's occupational functioning. In Ms. Mitchell's case, you have indicated she has severe fibromyalgia, however, this is not documented in any of her medical records. In addition, you have not provided medical support from any of Ms. Mitchell's physicians indicating she is unable to perform the duties of her occupation."

Plaintiff's federal lawsuit appealing that decision has followed.

## II.

The Policy grants to Hartford the discretion to interpret the terms of the Plan and to apply the terms to the facts. Specifically, the Plan states:

> **Who interprets policy terms and conditions?**
> We have full discretion and authority to determine eligibility for
> benefits and to construe and interpret all terms and provisions of
> the Group Insurance Policy.

Such language suggests the application of the arbitrary and capricious standard of review. The United States Supreme Court has stated that where the Policy gives the claims administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the administrator's benefit determination is reviewed for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 505-06 (6th Cir. 2005) (where the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the "highly deferential arbitrary and capricious standard is appropriate"). Under the arbitrary and capricious standard of review, the court's determination is based solely upon a review of the administrative record. *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005) (citing *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 613 (6th Cir. 1998)). The Court is mindful of the conflict of interest inherent in Hartford's dual role as insurer of the plan and the party authorized to determine whether Mitchell is entitled to benefits. While such a conflict "does not alter the standard of review . . . [it] should be taken into account as a factor in determining whether the . . . decision was arbitrary and capricious." *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998) (internal citation and quotation marks omitted).

  The Policy includes long-term disability benefits to eligible plan participants. A participating employee is eligible for long-term disability benefits if, among other things, he or she meets the Policy's definition of "disability." The disability analysis is divided into two tiers. For the first twenty-four months, one must be continuously disabled from his or her "own

occupation" only in order to receive benefits. The receipt of long term benefits even during the initial twenty-four month period is conditional. Benefits continue only so long as the recipient continues to be disabled and under the regular care of a physician.

Following the initial twenty-four month period, the claimant must demonstrate that he or she is disabled from "any occupation" for which she is qualified by education, training or experience in order to continue to receive benefits. The Policy defines "Disability" or "Disabled" as follows:

> **Disability or Disabled** means that during the elimination Period
> and for the next 24 months you are prevented by:
>    1.   accidental bodily injury;
>    2.   sickness;
>    3.   Mental Illness;
>    4.   Substance Abuse; or
>    5.   pregnancy.
> from performing one or more of the Essential Duties of Your
> Occupation, and as a result Your Current Monthly Earnings are no
> more than 80% of your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more
> of the Essential Duties of Any Occupation.

Under the Policy, Plaintiff bears the burden of proving that her alleged physical ailments render her totally disabled from her occupation. Plaintiff must submit "Proof of Loss" satisfactory to Hartford to establish disability.

III.

The Court has considered this case carefully because of concerns that Hartford might have an incentive to re-examine disability determinations and, thereby, reduce its continuing exposures. The Court is particularly concerned by the use of "independent" medical examiners who review existing records and reach different conclusions than treating physicians. Moreover,

the use of quotes from telephone conversations raises even greater concerns. These statements are second hand and completely unverified. These circumstances lend themselves to a high probability of misuse.

Even considering all of these concerns, the Court believes that procedures followed here do not suggest either a rush to judgment or an arbitrary or preordained result. Hartford made numerous requests of Plaintiff for medical records or other evidence supporting her claim. It attempted to obtain a further medical examination. It gave Plaintiff every opportunity to rebut the oral statements of her own treating physicians. Finally, Hartford followed an acceptable appeal process and requested reviews by two separate physicians. Consequently, the Court concludes that Hartford's method of re-evaluating this claim alone does not qualify as being arbitrary and capricious.

Hartford's re-evaluation is clearly permitted under the Policy. In fact, as Hartford noted, without the ability to re-evaluate, carriers would have an even greater incentive to initially deny benefits. Under this policy, it is clear that Plaintiff has a continuing obligation to substantiate her disability by responding to Hartford's reasonable requests for updated information. Moreover, a plan administrator has the right to re-examine its initial disability determinations where the evidence warrants it, without producing evidence that a "substantial change" has occurred in the employee's condition since the initial determination of benefits. *See Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273-74 (5th Cir. 2004). Unfortunately, Plaintiff's failure to timely and completely respond to Hartford's requests may have contributed to cause the denial of her claim.

IV.

Having resolved these preliminary issues, the question remains whether Plaintiff has symptoms or ailments that make her incapable of performing her occupation. More specifically the Court must determine whether Hartford's conclusion was arbitrary and capricious. Plaintiff argues that Hartford relied too much upon the opinions of in-house physicians and that Hartford failed to give satisfactory weight to Plaintiff's award of social security disability benefits. Neither of these arguments is sufficient to overturn Hartford's decision in these circumstances.

The Court has already discussed its concern about the use of paid physician reviewers. In this instance, however, the reviewers did not attempt to reach independent conclusions. They attempted to collect, verify and synthesize the existing opinions. Although the Court expressed its concerns about the use of second hand unverified references to phone conversations, Plaintiff had plenty of opportunity to rebut those opinions. And, the treating doctors themselves had the ability to do so as well.

Although the social security disability benefits award does not, standing alone, require the conclusion that Hartford's denial of benefits was arbitrary and capricious, it is "one factor the Court should consider, in the context of the record as a whole" in determining whether Hartford's decision was arbitrary and capricious. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). However, the award of social security disability benefits is not independently relevant to Hartford's decision about ERISA benefits without some reference to the specific evidence used to support the award. Therefore, Hartford's disagreement with the social security benefits determination is not evidence that its decision was arbitrary or capricious. Hartford never received the full social security opinion or related evidence which might have bolstered Plaintiff's claims.

The actual medical evidence concerning Plaintiff's ailments is quite confusing. Plenty of evidence suggests medical problems, but much less of it suggests a permanent and significant impairment of Plaintiff's ability to work. Indeed, Plaintiff seems to rely upon the fact that once she was provided benefits, Hartford was under some extra burden to disprove her entitlement. This is not so.

Hartford details all of the medical evidence it relies upon to conclude that Plaintiff is capable of performing her regular work. According to the reported testimony of Drs. Gleason and Rondo, Plaintiff can return to work. In fact, neither of these physicians appear to have opined that Plaintiff's inability to work was permanent. Consequently, the opinions each provided Hartford seem more like clarifications than an actual change.

In response to this evidence, Plaintiff presented no updated medical information to support her claim of permanent occupational impairment. Rather, she failed to meet her burden of showing her entitlement to benefits. Hartford's decision to change her benefit status was neither arbitrary nor capricious.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record